Each side has 20 minutes. Good morning, Your Honor. Paul Allione, four-appellant, Emile Kamel. Your Honor, I think there's two points worth emphasizing here on appeal. First is, it appears that the trial court's order granting the defendant's motion for summary judgment appears to be in conflict with some of the early rule – earlier rulings that the Court made on other facts that were related to that motion. In fact, this was made just a matter of months prior to the motion for summary judgment. Specifically, I'm speaking to the very early part of the case where, on February 9, 2004, the Court heard defendant's request for a preliminary injunction. In opposition to that, the plaintiff's – or rather, the defendant's equivalent attempted to defend themselves by saying, look, this matter has already been decided in a prior case, we've been acting in good faith. And to that, the Court responded that, quote, the matter on appeal appears largely irrelevant to the case before the Court, unquote, and then went on to grant the preliminary injunction in favor of my client. Just a matter of days later, Equilon brought a motion to dismiss, and that again asserted the grounds of collateral estoppel, res judicata, on the basis that in 2003, they were determined to have acted in good faith. Here again, the Court rejected that argument by saying that, quote, the current action involves completely different facts, unquote, and it goes on from there. It elaborated and then denied the motion. Ultimately, when the motion for summary judgment was made, separate statement number 26, strike that number 21, and this is on the appellant's excerpt of record number 26. Indeed, plaintiffs cited as an undisputed fact that the matters on appeal were largely irrelevant, and prior counsel for defendant or for plaintiffs agreed that that was undisputed. Yet in the face of these rulings where there seems to be a continuum of assertion of what happened in 2003 as a defense, the Court in its order seemed to say something quite different. On its first page, ironically, it again reiterates its position that, quote, Camel 1 and the current action are factually distinct from one another, unquote. This is the last paragraph on the page, the first page of the order, and this is at Appellant's ER 36. But at page 3, the middle of that page under sub-paragraph A, this is the crux of the Court's finding, in my opinion. It says, quote, In Camel 1, the Court determined, comma, in a bench trial that defendant's decision to sell the property was made in good faith in the normal course of business, period. And the paragraph goes on, and it concludes by saying that the Court finds defendant's continued efforts to sell the property were made in good faith in normal course of business, unquote. My point is, Your Honor, that this part of the order seems to be directly at odds with repeated findings of at least two findings by this very same trial court just months prior, and it's even at odds for a stipulated fact, which was entirely irrelevant. And yet the Court reaches back and uses this very same case to as a premise of why it gave its ruling. So I find it at odds and irreconcilable. At a minimum, it created a triable issue of fact. If the Court itself had wavered on this issue, surely a trial on the merits would be in order. And this brings me to the second point that I think is worth underscoring here. The code itself is remedial. I mean, it's a wordy thing. It's complicated. It's, you know, I don't wish this on my worst enemy. But the bottom line is very apparent. The courts have repeatedly said that this is supposed to even the playing field. And if this is, in my mind, Your Honors, this is an equitable remedy. And at the end of the day, you need to sit back and you need to say, was justice served? Was equity served here? And my God, you got to you have a very well-funded defendant who has found to have been given, who was expressly found not to have given a bona fide offer. He was in, it was in violation of the PNPA. And then what was the result of that? The ultimate result was it gave them the opportunity to double up the price, which my client ended up having to do. Strikes me that this is exactly what Judge Morrow had said earlier in the matter. I like her language. It is a violation of the spirit of the PNPA, and I think that couldn't have been said any better. There is just sort of an offense to the result of this case. And in my opinion, there should have been a footnote at the bottom of the PNPA statute, which said, by the way, was equity and justice served here? And if it wasn't, do something about it. And I think that's the second point here. Well, that footnote's not in the statute. All they have to do is give them the right to match the offer, right? Well, that's one of the possible remedies in the basket of remedies. The Codes expressly says, do whatever you need to do, and I'm paraphrasing, of course, but do whatever equity requires. And that's the question.  And that's the question. Where do you see that in here? It is – I'd have to fumble, Your Honor, to get the exact site, but it's – when it – in the remedial portion, I think it's a 20 – it's in 2802. I don't have a committed memory, but it's a subparagraph, and it was quoted in the briefs. And it goes on to say that it's the equity is necessary, that the Court is to apply anything in equity to justify the result. And I guess what I'm saying here, it just seems so inequitable, what happened here, that they were found in violation, and as a result of the violation, they – And he won. Correct. He won the first time around. Correct. And then years pass, and there's another sale. Correct. The value of the property has gone up. That's right. Well, that's life. You know what I mean? Well, but what the Court never examined was, the decision to sell in 2003, is – was that in good faith? And what the Court answered says, well, it was a good decision back in 2000, so therefore, the 2003 is good. I'm arguing that they're two distinctly different cases. Indeed, the trial court said so twice, a third time in the first page of its order. But isn't – isn't it entirely appropriate for the judge to look at the entire continuum, not just the 1998 effort, which looks like it's an effort to evade compliance with environmental requirements, but then you've got a bulk sale of 100 – 100 stations. It seems highly improbable that – that Equilon wants to sell 100 stations just to get rid of your client as a franchisee. And then, lo and behold, 2003 comes along and Festival is still there with two others, and the judge finds that to be compelling evidence that there are – there are market conditions and there are good faith bona fide reasons for wanting to sell, and that becomes a part of his justification for the summary judgment. It seems to me entirely appropriate for a judge to be looking at that entire spectrum. Precisely my argument, Your Honor. That's exactly what I argued. And what – what was missing from the totality of the continuum here was that, in my opinion, the trial court failed to look at what I call Commel I, which is the 1998 case. And if you look at the totality of the circumstances, there's an ongoing dispute from Mike Klein as a franchisee. He goes back from 1995 when he said, hey, this place is a dump. Do something about it. And they did something about it. They tried to pull the plug on them. Judge Morrill found it to be very dubious circumstances. And I think that's where the continuum of totality begins from beginning to end, and that is something that the jury just never had a chance to see. I think that's the whole finding of the fact. Instead, it was a very, very narrow ruling by the judge. He says, look, look at the numbers here. Your appraisal is not much different than their appraisal. It's numerically irrelevant, you know, it doesn't amount to much. And you were also in good faith back in 2000, so this is okay. I think he's cherry-picking from the facts. We need to look at the big picture, the continuum from beginning to end. And I think the question of whether they acted in good faith or not would be answered in a very different way. And I'd like to reserve my time and opportunity. Thank you. Good morning, Your Honors. Scott Watson on behalf of the Eppley Echelon Enterprises, LLC. I think as the Court's well aware, there's basically two issues here. The first is a question of good faith and in the normal course of business. Was Echelon's decision made in good faith and in the normal course of business? And then the second is, was Echelon's offer bona fide? Did it approach the fair market value of the station? I think the answer on the record below is clearly yes as to both questions. I think that the answer even on the record as appellant would have this Court supplemented on appeal is clearly yes. There's simply no tribal issue of fact as to either of these points. With regard to the decision to sell the good faith and normal course of business decision, the requirement is essentially as interpreted by the case law that the decision to sell and to non-renew the appellant be made not as a sham or pretextually, not as an artifice. And that it be made through the normal business decision making process. And I submit that there's simply no tribal issue of fact on that point here. The district court had found in 2003 in the trial that Shell's original decision in 2000 was made in good faith and at that time he relied on the testimony of Mr. Hallberg. That is the same testimony that was in the record in 2000, in this proceeding at summary judgment. And the testimony was the same and the testimony was as follows. That Equaline looked at all of its assets beginning in 1999. That Equaline tried to identify stations without growth potential and make a determination to sell those stations. That it looked at all the stations in the Los Angeles region. That it applied the same standards to every station. And as the Court has already noted, it ended up selling over 130 stations in a bulk sale. Camel's station, Appellant's station, was part of that bulk sale. And the reason that Equaline elected to sell it was a decision in the normal course of business. There's no dispute as to that. In the record, there is absolutely no dispute as to the process that Equaline went through or Equaline's motivation. Mr. Hallberg's testimony is undisputed. It's in the defendant's excerpt of record at 1112. I'd like the Court to take a look at it. Regardless of whether the Court were to conclude that the finding in the 2003 trial was collateral estoppel, this evidence is sufficient to find that there is no triable issue of fact over Equaline's decision to sell. Courts have recognized the reviews of assets, such as the one that Equaline undertook here, are legitimate. I'd refer the Court to the Beck case out of the Seventh Circuit, the Magerian case out of the Northern District of California. And in the face of that kind of evidence, the Appellant was required to present evidence to the Court that disputed Mr. Hallberg's testimony. The Appellant didn't do that. I invite the Court to look at the evidence presented at the District Court below. There were only two facts really presented on this point. The first was that the third-party offer by Festival contained a restrictive covenant. It's far from clear to me why that is evidence of anything, except perhaps that Mr. Camel got a better deal on the station because his sale to him did not contain a restrictive covenant. And the second is that Equaline had a company-owned station in proximity to the Appellant's station. The Appellant had revised his declaration to acknowledge that that station is almost three miles from the Appellant's station. And Appellant lacked any foundation for his statement that that station was owned by Equaline. In fact, the only evidence in the record that's admissible on that point is the declaration of Mr. Mustaine, which was submitted on reply by Equaline in rebuttal. And Mr. Mustaine, who is an Equaline employee, stated that Equaline does not own that station. That station is owned by a third party who then contracts with Equaline to buy gasoline and to brand the station. The district court correctly found, at any rate, that both of these points, the other station three miles away, and the fact that there is a restrictive covenant in the Festival offer, was irrelevant here. And I submit that that's correct. I'll note also to the court that the Appellant sought reconsideration of the district court's ruling on summary judgment. That's in Appellant's excerpt of record tab 37. And if the court looks at that, we'll see that there was no dispute at that time that Equaline's decision was made in good faith and in the normal course of business. Now, in this court, Appellant has basically abandoned the arguments that he made to the district court below. Instead, he tries a different tack. He asks the court to take judicial notice of evidence that was not presented, really, to the district court below. That's the 1998 litigation and two letters that he claims he wrote to Schell in 1995. The court shouldn't consider this evidence. It wasn't presented below. And I think if you look at Appellant's own cases on this point, while courts will sometimes consider questions of law that were not raised below, none of Appellant's authority supports the notion that this court on appeal should take notice of facts and consider factual arguments that were not made below. Even if this court wanted to consider that evidence, furthermore, it's of no moment. The 1998 order by Judge Morrow, contrary to Appellant's implications, contains no finding of bad faith by Equaline. At the time, Equaline was faced with environmental regulations that were coming into effect. Equaline thought that the cost of complying with those regulations was kind of prohibitively expensive in view of the economics of the station, and it sought to avoid having to expend those monies. The district court found that that was not a permissible basis for termination of the franchise, and that Equaline had failed to comply with a notice requirement contained in the PMPA on this point. And if you look at the Ninth Circuit opinion, the Ninth Circuit only reaches the notice point, says it doesn't even need to consider the other point. At any rate, there's no finding of bad faith in that opinion. It wasn't a question presented to the court in that context. That was a PMPA injunction, which is a very low standard, as this court is probably aware. The injunction standard on the PMPA is much lower than the ordinary injunction standard, preliminary injunction standard. And the appellant has cited no case for the proposition that the fact that there was prior litigation between the parties, that appellant had some success in that prior litigation, somehow creates a triable issue of fact as to Equaline's motivation. In fact, the only authority I could find on this point is the Majurian case, which we've cited to the court. And in that case, the plaintiff sued Exxon in a separate state court action. Exxon then went forward, did exactly the kind of review of assets that we see Equaline undertaking here, and Exxon determined to sell the station. The plaintiff claimed that there was a triable issue of fact as a result of this separate state court action, that the implication would be that Exxon was punishing the plaintiff for that action. And the Majurian court said no. The mere fact that there's this other action out there brought by the plaintiff against Exxon in that case, that's not sufficient to create a triable issue of fact on the question of good faith. Even if the court considers all of the evidence that appellant asked it to on appeal, and I don't think it should, all that appellant has done here is speculate. None of the facts that he offers, either below or on appeal, are in any way directed to the actual decision-making process, to the finding of the district court that the decision was made in good faith. And I submit that the Hallberg testimony is simply dispositive on this issue. Was there any evidence that the bulk sale of 130 plus stations structured in 2000 was motivated in any way by either this station owner or any other particular station owner dissatisfaction with the relationship or the responsibilities exercised by Exxon in taking care of their stations? No, Your Honor. I'm not aware of any evidence in the record. I'm not aware of any evidence in the record. The only evidence in the record that I'm aware of on this point is the Hallberg testimony, which we provided to the court in our exceptive record. Let me turn to the second prong of the inquiry here, and that's the bona fide prong, which this court in the Ellis case stated basically means that the offer to purchase the property has to approach fair market value. The district court found there was no tribal issue on this. There are basically two components to these offers. The first component is the offer for the land, the land value. Here that was set based on three third-party offers, really, at 850, 844, and 776. There is some implication by the appellant that somehow Festival and Equilon were conspiring to set the value on this property. There's no evidence to support that. That's pure speculation. Is there any evidence that the other two were shills? No evidence at all, Your Honor. And as you can see, the Festival and the Karma offers within $6,000 of each other, it's less than 1%. Pretty clear and compelling evidence, I think, that the land was worth $850,000. Appellant doesn't really challenge that at this stage in the case. Indeed, on reconsideration of summary judgment, appellant basically abandoned any argument that the land was improperly valued here. The second component of the offer is the requirement that Equilon sell the improvements and the equipment on the property. That's required under the Roberts case. Equilon has to offer that property or offer the improvements and the equipment. Equilon brought in an appraiser. The appraiser set the value. Appellant has an appraiser who sets a slightly lower value. The district court looked at those two values and concluded that the difference in valuation for the property, which is what the PMPA is concerned with, 3.86%. Numerous courts, virtually every court to consider the issue, have acknowledged that there's going to be slight variations here between appraisers. That's not enough to create a tribal issue of fact. Appellant doesn't argue on appeal that that's enough to create a tribal issue of fact. Instead, appellant abandons the arguments made at the district court and now says that the price should be set at a 2,000 level. That issue was the entire issue in the 2005 Ninth Circuit Appeal. Appellant made no effort to distinguish that case, except to note that the district court here, at the motion-dismissed stage and the preliminary injunction stage, found that what we are calling Camel 2, and I don't think it matters what you call it, but what we are calling Camel 2 related to a different offer. The district court was correct about that. In Camel 2, the offer was based on a third-party offer for the land and an appraisal of the property. In Camel 1, what we're calling Camel 1, the station was sold as part of a bulk sale. Couldn't use a third-party offer. So there were clearly differences between the case on those points. But on this point, the question of whether appellant is entitled to purchase the station at a 2,000 price, there is no distinction. And appellant can make no distinction between those cases. I invite this Court to read appellant's opening brief from the prior Ninth Circuit case. The arguments are identical. This Court rejected appellant's precise argument in that case. It noted that in 2003, at trial, the district court had found that appellant acted in good faith. And that as a result, the district court ordered the remedy that is most common in these cases. And that is that the parties are returned to their franchise relationship. And the injunction is dissolved, and the parties are free to go forward under the terms of the PNPA. Both the LMP service case, which the Ninth Circuit cited in the appeal from Camel 1, and, well, the LMP service case and the portion that is cited by the Ninth Circuit in the Camel 1 opinion, both recognize the fact that after the injunction is dissolved, the franchisor might elect again to non-renew the franchise and sell the station. That was clearly in the contemplation of both this Court and other courts when it's ordered that remedy. And in fact, excuse me, and in fact, in the prior Ninth Circuit appeal, this Court was well aware that the property was going to be sold again to Mr. Camel. The offer had already been made at the time that the argument occurred. And indeed, I believe at the time that the briefing had occurred. So the Ninth Circuit had all the facts before it in that appeal that you have before you on this point today. And we submit that that case is completely controlled. In 2005, and again here today, Appellant cites absolutely no authority for the proposition that he should have the opportunity to purchase the property at below market value five years later. Appellant's primary argument appears to be that the failure to compel the sale of the property at 2,000 values is inequitable and therefore violates the PMPA. I think, as the Court has probably noted, there is no kind of general equity provision in the PMPA. The courts that have considered the PMPA have generally said, the PMPA sets certain standards, certain guidelines that the franchisor is required to meet. And here, there's been a finding that the franchisor has met those guidelines. And I submit that there's no tribal issue as to any of those things. As a result, there's nothing inequitable about the appellant purchasing the station at the fair market value. In fact, that is expressly what the PMPA requires. And while it's true that there are remedial purposes for the PMPA, and the cases that Appellant cites recite those, the fact of the matter is that the PMPA exists to protect the interest in a continuing franchise relationship. And then it provides as a remedy, in the event that the franchise relationship ends, the opportunity to buy the property at the fair market value of the property. That's precisely what happened here. And accordingly, neither the PMPA nor equity is offended by the fact that the appellant got the opportunity to purchase the station at precisely the market value of the station at the time that he purchased it. And in the interim, the PMPA and the injunctions issued by the district court permitted the appellant to occupy and operate the station under a franchise relationship from 2000 until 2005. Both parties bore the risk that the real estate market might go up or down during that period. This court, in its prior decision, acknowledged that. Appellant's argument here that equity is not being done is really just a product of Southern California real estate during the relevant times. If an offer was made today and a five-year extension occurred, it's quite possible that during that time, the value of the property would go down. But the rule of law is not going to turn on the vagaries of the real estate market during any particular time period. And the Ninth Circuit made that clear in the 2005 KML 1 opinion. So on the only evidence in the record, either the district court or in this court, the fact of the matter is that there can be no tribal issue of fact that Equan's decision was part of his normal decision-making process and in good faith. The appellant does not challenge the district court's conclusion here that Equan's offer approached fair market value except to advance the previously rejected argument that he was entitled to buy the property at 2,000 prices. I submit that unless the court has any further questions, I have nothing further. Thank you very much, Mr. White. Thank you very much. Just a brief response, if I may. The citation that I was fumbling for earlier, I have that now, and it is as follows. It's 15 U.S.C., Section 2805, Sub B. It's short and worthy of quoting, if I may. It says, In any action under subsection A of this section, the court shall grant such equitable relief as the court determines is necessary to remedy the effects of any failure to comply with the requirements of Section 102 or 103 of this title, including declaratory judgments, mandatory or prohibitive injunctive relief, and interim equitable relief, unquote. So exactly as I said, in the midst of this hornet's nest of a code, you've got the crux of it, which says due equity. And that would have interpreted the section you just read to mean that the court can do damages, money damages, or can issue injunctions or declaratory relief. Fair enough. I don't disagree with your reading, as ultimately it has to, at the end of the day, the parties have to be, have, justice has to be served. Now, whether that's served by providing damages, whether it's an affirmative relief by injunction, I don't think the court, the code isn't specifying. You're saying, you know, here's a basket of remedies. You do what you must to make sure that justice is done. The courts have repeatedly said this is an uneven playing field. Why is it inequitable for a franchisee to have an opportunity to buy the station and equipment, property and equipment at the market value at the time? Why is that inequitable? Because the delay, the delay in timing was directly the result, and uniquely under control of the franchisor, who, it was determined by jury, had provided an offer that was in violation of the code. I know of no other circumstance where someone can violate a code and then come out in a better position. I don't understand that. It seems inequitable to me. It just conflicts with the fundamental desires of this code. And briefly, it doesn't – there's some very – Take me back to the – take me back to the time of the violation when the offer was deemed to be not a bona fide offer. On a going forward basis, what would – what would the law as you interpret it write for these people? Well, at that time, unfortunately, the parties were married to the remedies that they went up on appeal. The other appellate decision, which counsel refers to, rightfully said that – that the remedy that they were seeking was to, quote, force the sale. And the court – and I'm reading from the page 2 of that order. It says he, Camel, asserts that the district court should have issued an injunction against Equilon forcing the sale of the surface station rather than funding the – rather than finding that the franchise relationship remained in effect. And it goes on to say at page 3 that Camel, my client, failed to cite any case law or any portion of the PMPA itself that would mandate a forced sale of station. Unquote. This was reviewed in an abuse of discretion standard. And they're right. You ask for – you ask for the wrong remedy. You come up here on abuse of discretion. You're going to get what you made. And what the trial court did back then was to say, look, you violated the PMPA. I'm leaving you guys where I found you. You get your money back out of ESPRO. You get a little interest. Here's some – here's some attorney's fees. Go away. That's what they asked for. That's what they got. 112 days later, they said, gee, we've got a new idea. We're going to sell the station. Guess what? The price has now doubled what the jury found it to be a short while ago. Now, there's two – there's two prongs to this. One is, did you make a decision that was in good faith and in the usual course of business? The court in Camel – we'll call it – I've called it two. His counsel's called it one. But you know what I'm talking about. Said that was in the usual course of business. It was in good faith. Okay. I take – as I mentioned earlier, I take – I take exception with reaching back in time to a totally different deal and saying you're in good faith there, therefore you're in good faith here. I take exception with that. But even if the court was right in that reasoning, the second prong is, was this price arrived at in good faith in the usual course of business? And the analysis, Your Honor, I would suggest is not, well, what's the going rate now? That is far too narrow an examination. You're looking at a vacuum. Okay. What is it now? As you, I think, Indicator, alluded to in the inquiry, there's a totality of circumstances that have to be investigated here. And it is ripe with retaliatory motives. You know, the counsel spoke to the lack of evidence of these sort of things. Well, the gentleman who offered the original – who was the principal to Festival in the first matter and had the Polk sale, well, he's the one that came in and justified the high. Counsel from Echelon. Seemed a little too cozy to me. And then the next time a price comes up in the next matter and they need to justify that price, guess who comes up with the highest bid? It's the same fellow from Festival. I find that cozy and coincidental, too. And all this talk about, well, you know, you're – we're just shutting down this business. It's not economical. Judge Morrow found expressly in 1998 that this was a profitable station. And that suggestion that this was unequitable or no longer economic to run was contrary to the facts before her. And furthermore, the argument that, well, you know, it's going to be very cost-prohibitive to change out the tanks and so on and so forth, again, Judge Morrow said, no, you've known about this for a long time. You just conveniently use it now after the franchisee is complaining that you're treating him poorly. That is part of the totality of the circumstance. By the way, with regard to the other – the so-called other appraisals that came in or so-called offers, you know, all I can say is you might want to take a look at those so-called offers. They're single-page letters that just say, you know, dear Doug, I offer you, you know, here's my offer. That's one strange-looking cookie. I've, you know, I've seen a lot of offers at this level of business, very, very odd. So I think there's reasons on the surface to question was this – was the so-called decision pretextual. And I think, again, my client was robbed of his day in court. This is something that should be – go in front of a jury. The trial court judge himself was – had flip-flopped on these issues himself. So I think there's room enough for a difference of opinion by way of jury. And unless you had any other questions. Roberts. Thank you to both gentlemen. Thank you. The case just argued is submitted. Good morning.
judges: T.G. Nelson, Silverman , Leighton